Docket Number 17-5084

Oral Argument Not Yet Scheduled

**IN THE
UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA**

DELAWARE RIVERKEEPER NETWORK; MAYA VAN ROSSUM, the
Delaware Riverkeeper,

*Plaintiff/Appellants*,

v.

FEDERAL ENERGY REGULATORY COMMISSION

*Defendants/Appellee*,

and

PENNEAST PIPELINE COMPANY,

*Defendant-Intervenor/Appellee*.

*Appeal from the United States District Court for the District of Columbia, No.
1:16-cv-416*

**APPELLANTS' OPENING BRIEF**

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
aaron@delawareriverkeeper.org

Jordan Yeager
Curtin & Heefner LLP
2005 S. Easton Road, Suite 100
Doylestown, PA 18901
jby@curtinheefner.com

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

**A.     Parties and Amici**

The following parties appeared before the United States District Court for the

District of Columbia:

> 1. The Delaware Riverkeeper Network, as Plaintiff/Appellant;

> 2. The Delaware Riverkeeper, Maya van Rossum, as Plaintiff/Appellant;

> 4. Federal Energy Regulatory Commission, as Defendant/Appellee;

> 5. PennEast Pipeline Company, as Defendant-Intervenor/Appellee;

**B.     Rulings Under Review**

The following rulings are at issue:

March 22, 2017 Order (granting Federal Energy Regulatory Commission's

Motion to Dismiss) in D.D.C. No. 1:16-cv-00416 (Judge Tanya S. Chutkan),

Dist. Ct. Dkt. No. 29, *Delaware Riverkeeper Network, et al. v. Federal

Energy Regulatory Commission et al.*, 243 F.Supp.3d 141 (D.D.C. 2017).

## RULE 26.1 DISCLOSURE STATEMENT

The Delaware Riverkeeper Network is a nonprofit 501(c)(3) membership organization that advocates for the Protection of the Delaware River, its tributaries, and the communities of its watershed. The Delaware Riverkeeper Network does not have any parent corporation, nor does it issue stock.

Respectfully submitted this 25th day of September 2017,

By: *s/ Aaron Stemplewicz*

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, Pennsylvania 19007
Phone: 215.369.1188
Fax: 215.369.1181
aaron@delawareriverkeeper.org

iii

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................ iii

GLOSSARY .................................................................................. vii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES.......................................................2

STATUTES AND REGULATIONS ..................................................3

STATEMENT OF THE CASE...........................................................3

I.      Background............................................................................3

        A.      The Federal Energy Regulatory Commission .......................3

        B.      The Natural Gas Act ........................................................5

        C.      The Funding Mechanism...................................................5

        D.      The PennEast Pipeline Project .........................................7

STANDARD OF REVIEW ...............................................................8

SUMMARY OF THE ARGUMENT .................................................8

ARGUMENT ..................................................................................11

I.      DRN States a Claim Upon Which Relief can be Granted............................11

        A.      Article I, Section 27 of the Pennsylvania Constitution
                Provides a Property and Liberty Right that Sustains
                DRN's Due Process Claim................................................11

                i.      Section 27 Creates an Individual Right ....................15

                ii.     Section 27 Recognizes Environmental Rights as a Liberty

Interest on Par With Political Freedoms ...................................22

iii.    Pennsylvania Courts have found Section 27 clearly confers a
        liberty and property interest ....................................................26

B.    DRN's Members' Real Property at Stake is not Protected
      Via Eminent Domain Jurisprudence ...................................................27

C.    The District Court Erred in Concluding as a Matter of Law that the
      Commission is Not an Unconstitutionally Biased Adjudicator, and
      Does Not Appear to be an Unconstitutionally Biased Adjudicator ....29

i.      Legal Standard for Adjudicator Bias ........................................29

ii.     Pipeline   Approvals   Result   in   Direct   and
        Substantial Benefits to the Commission ...................................32

iii.    The  Finite  Lifespan  of  Natural  Gas  Pipeline
        Projects Compels New Pipeline Approvals ..............................39

iv.     The  Commission's  Naturally  Rising  Fixed  Costs
        Creates  and  Incentive  for  the  Commission  to
        Approve Pipeline Projects........................................................42

v.      The Budget Act's Funding Mechanism is Uniquely
        Unconstitutional.......................................................................44

vi.     Examples  of  Prior  Actual  Bias  Provide  Evidence
        of the Commission's Unconstitutional Appearance
        of Bias ......................................................................................46

vii.    Congress  Does  not  Constrain  or  Control  the
        Commission's Budget ...............................................................49

D.    The Court Below Failed to Address or Acknowledge DRN's Separate
      Due Process Claim Regarding the Commission's Unlawful Use of
      Tolling Orders ..................................................................................52

CONCLUSION ..................................................................................................56

ii

# TABLE OF AUTHORITIES

## Commission Orders

43 FERC ¶ 61,443 ...............................................................................48

135 FERC ¶ 61,233 .............................................................................48

154 FERC ¶ 61,190 .............................................................................48

## Cases

*Alpha Epsilon Phi Tau Chapter Housing Authority v. City of Berkley*, 114 F.3d 840
(9th Cir. 1997) ............................................................... 30,38

*Anderson v. Sheppard*, 856 F.2d 741 (6th Cir. 1988)...............................31

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403
U.S. 388 (1971) ...............................................................................2

*City of Rochester v. Bond*, 603 F.2d 927 (D.C. Cir. 1979).......................2

*Clark v. Rameker*, 134 S. Ct. 2242 (2014)..............................................54

*Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Tp., York
County, Pa., Located on Tax ID #£440002800150000000 Owned by Brown*, 768
F.3d 300 (3d Cir. 2014) ......................................................................28

*Davis v. Passman*, 442 U.S. 228 (1979) ...............................................2

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1971) ..................31

*Delaware Riverkeeper Network, et al. v. Federal Energy Regulatory Commission
et al.*, 243 F.Supp.3d 141 (D.D.C. 2017).............1,8,11-12,15,27,32,33,34,40,44,50

*E. Tenn. Nat'l Gas Co. v. Sage*, 361 F.3d 808 (4th Cir. 2004)................................28

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003)........... 35,44

*El Paso Natural Gas Co. v. United States*, 750 F.3d 863 (D.C. Cir. 2014) ...........8

*Esso Standard Oil Co. v. Cotto*, 389 F.3d 212 (1st Cir. 2004) ..................... 47,49,50

*Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136 (1st Cir. 2008) ................38

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136 (2d Cir. 2013) ...............53

*Five Flags Pipe Line Co. v. Dep.'t of Transp.*, 854 F.2d 1438 (D.C. Cir. 1999) ......2

*Gen. Am. Oil Co. of Texas v. Fed. Power Comm'n*,
  409 F.2d 597 (5th Cir. 1969) ...............................................................................54

*Gibson v. Berryhill*, 411 U.S. 564 (1973) .......................................................... 30,33

*Guardian Pipeline, L.L.C. v. 295.45 Acres of Land*, 2008 WL 1751358 (E.D. Wis.
  April 11, 2008) ......................................................................................................5

*Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) .......................11

*In re Murchison*, 349 U.S. 133 (1955) ........................................................... 31,32,45

*Jackson v. Indiana*, 406 U.S. 1845 (1972) .............................................................51

*Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 403 F.3d 1249 (D.C. Cir. 2005) ...11

*Kokajko v. FERC*, 837 F.2d 524 (1st Cir. 1988) ....................................................54

*NO Gas Pipeline v. FERC*, 756 F.3d 764 (D.C. Cir. 2014) ...................... 2,41,43,56

*Noatex Corp. v. King Const. of Houston, LLC*, 864 F.Supp.2d 478 (N.D. Miss.
  2012) ....................................................................................................................51

*Oneok, Inc. v. Learjet, Inc.*, 135 S.Ct. 1591 (2015) .................................................5

*\*Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d
  911 (Pa. 2017) .............................................................. 9,12,13,14,16,20,25,26,27

*\*Robinson Tp., Washington County v. Com.*, 83 A.3d 901 (Pa. 2013)
  ................................................................9,12,13,14,15,16,20,21,24-25,26,27

*Schneidewind v. ANR Pipeline*, 485 U.S. 293 (1988) ..............................................3

iv

*Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004) .........................................8

*Transcontinental Gas Pipe Line Company, LLC v. Permanent Easement for 2.14 Acres*, 2017 WL 3624250 (E.D. Pa., August 23, 2017).......................................28

*\*Tumey v. Ohio*, 273 U.S. 510 (1927) .....................................................................30

*Ungar v. Sarafite*, 376 U.S. 575 (1964)..................................................................31

*United Church of the Med. Ctr. v. Med. Ctr. Comm'n*,
689 F.2d 693 (7th Cir. 1982) ...................................................................... 30,33,38

*United States v. Gaubert*, 499 U.S. 315 (1991) ......................................................11

*\*Ward v. Village of Monroeville*, 409 U.S. 57 (1972).......................................30,33

*Williams Natural Gas Co. v. Oklahoma City*,
890 F.2d 255 (10th Cir. 1989) ..................................................................... 28-29

**Federal Statutes**

15 U.S.C. § 717(b) ...................................................................................................5

15 U.S.C. § 717f(c)(1)(A).........................................................................................5

15 U.S.C. § 717f(e) ..................................................................................................3

15 U.S.C. § 717f(h)..................................................................................................28

28 U.S.C. § 1291 .....................................................................................................2

42 U.S.C. § 7171(a)-(b) ...........................................................................................4

*\*42 U.S.C. § 7178................................................................................................1,6

**Federal Regulations**

18 C.F.R. § 382.202 ..............................................................................................6,35

**State Constitutions**

Pa. Const. Art. I.........................................................................12,13,22,25

**Secondary Sources**

1970 Legislative Journal - House ......................................................14-15,18,20,25

*A Legislative History of Article I, Section 27 of the Constitution of the Commonwealth of Pennsylvania*, 24 Widener L.J. 181 (2015)....... 12,17,18,24,25

Statement of Policy, No. PL99-3-000, 88 FERC ¶ 61,227........................................4

*Taking the Pa. Constitution Seriously When it Protects the Environment: Part II – Environmental Rights and Public Trust*, 104 Dickinson L. Rev. 97, 142-43 (1999).................................................................................................19

1885588.1/50442

# GLOSSARY

| | |
|---|---|
| DRN | Delaware Riverkeeper Network, and the Delaware Riverkeeper |
| Commission | Federal Energy Regulatory Commission |
| Omnibus Act | Omnibus Budget Reconciliation Act of 1986 |
| PennEast | PennEast Pipeline Company, LLC |

1885588.1/50442

**INTRODUCTION**

Appellants, the Delaware Riverkeeper Network, and the Delaware Riverkeeper, ("DRN") appeal the United States District Court for the District of Columbia's decision to grant the Federal Energy Regulatory Commission's (the "Commission") and PennEast Pipeline Company's ("PennEast") motions to dismiss. *See Delaware Riverkeeper Network, et al. v. Federal Energy Regulatory Commission et al.*, 243 F.Supp.3d 141 (D.D.C. 2017) (hereinafter referred to as the "*Riverkeeper*"); JA____. As DRN contends in the Complaint, the Commission is unable to make unbiased determinations on natural gas pipeline approvals because of a provision of the Omnibus Budget Reconciliation Act of 1986 (the "Omnibus Act") which requires the Commission to obtain all of its annual operating costs directly from the entities it regulates (hereinafter referred to as the "Funding Mechanism"). 42 U.S.C. § 7178. DRN also separately challenges as a violation of due process the Commission's use of tolling orders to delay, obfuscate, or otherwise prevent timely judicial review of final agency action.

On March 22, 2017, the District Court issued an Order, JA__, and Opinion, JA____, that dismissed DRN's Complaint. DRN filed a timely Notice of Appeal on April 20, 2017.

**JURISDICTIONAL STATEMENT**

1

This action arises under the Fifth Amendment to the Constitution of the United States. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Davis v. Passman*, 442 U.S. 228 (1979). DRN seeks a declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202, and appropriate injunctive relief.

While Congress may freely choose the court in which judicial review may occur, *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979), if it makes no specific choice, then an aggrieved person may pursue constitutional claims in federal district court pursuant to federal question jurisdiction. *See Five Flags Pipe Line Co. v. Dep.'t of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1999).

This Court has already determined that the Budget Act does not specify "the court in which judicial review . . . initially may be had." *Id*. at 1440. As such, jurisdiction in the U.S. District Court for the District of Columbia was appropriate. *See NO Gas Pipeline v. FERC*, 756 F.3d 764, 768-9 (D.C. Cir. 2014). This Court has jurisdiction to hear appeals of all final decisions of the U.S. District Court for the District of Columbia pursuant to 28 U.S.C. § 1291. *See* 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1)    Did the District Court err in finding that DRN failed to state a claim because it did not demonstrate a deprivation of a liberty or property interest? Suggested Answer: Yes.

2

2)   Did the District Court err in finding that DRN failed to state a claim for a due process violation as a result of structural bias, or the appearance of structural bias?

Suggested Answer: Yes.

3)   Did the District Court err by failing to address DRN's claim of due process violations resulting from the Commission's use of "tolling orders"?

Suggested Answer: Yes.

## STATUTES AND REGULATIONS

The Addendum presents pertinent statutory and regulatory provisions.

## STATEMENT OF THE CASE

## I.   BACKGROUND

### A.   The Federal Energy Regulatory Commission

The Commission is an independent executive federal agency that, among other statutory responsibilities, regulates the interstate transmission and wholesale sale of natural gas. *See* Compl. ¶ 64; JA___; *see generally Schneidewind v. ANR Pipeline*, 485 U.S. 293, 301 (1988). The Commission is tasked with considering the authorization of pipeline projects by deciding whether to issue a Certificate of Public Convenience and Necessity ("Certificate") for the project. *See* 15 U.S.C. § 717f(e) (outlining the basis for issuing a certificate). The Natural Gas Act requires the Commission to prepare the environmental review documents -- pursuant to the

3

National Environmental Policy Act -- for proposed natural gas facilities. *See* Compl. at ¶ 72; JA___. The Commission is therefore responsible for the generation and review of Environmental Assessments and/or Environmental Impact Statements related to proposed jurisdictional projects, including natural gas pipeline projects. *Id*. at ¶ 73; JA___.  When a certificate application is filed for a natural gas pipeline project the Commission's regulations dictate that the Commission will approve an application for a certificate only if the public benefits from the project outweigh any adverse effects. *Id*. at ¶ 119 (*citing* Statement of Policy, No. PL99-3-000, 88 FERC ¶ 61,227, at 28 (September 15, 1999)); JA___. For a proposed Commission jurisdictional natural gas project, Commission staff review a project applicant's submissions and make a recommendation to the Commissioners. *Id*. at ¶ 75; JA___. The Commissioners then vote on whether to approve a project application or deny the application with each Commissioner providing one vote. *Id*. at ¶ 76; JA___.

The Commission is comprised of up to five voting-members appointed by the President, with the advice and consent of the U.S. Senate, with no more than three being members of the same political party. *See* Compl. ¶ 60; JA___; *see also* 42 U.S.C. § 7171(a)-(b). Commissioners serve for five-year terms and have equal votes on regulatory matters. *See* Compl. ¶ 61; JA___.

1885588.1/50442

The Commission is the only independent executive federal agency that is entirely funded by the industry that it regulates and that has adjudicatory powers over that industry. The Commission also enjoys a unique concentration of power that allows it to automatically confer eminent domain authority to project applicants who obtain Certificates. *Id*. at ¶ 241; JA___. Indeed, pipeline companies need not even show they negotiated in good faith with impacted landowners before exercising the eminent domain authority the Commission provides. *See e.g.*, *Guardian Pipeline, L.L.C. v. 295.45 Acres of Land*, 2008 WL 1751358, at *14 (E.D. Wis. April 11, 2008) (collecting cases). Additionally, the Commission's siting of pipeline projects and its environmental review of pipeline projects preempts all conflicting state and local zoning and regulatory authority. *See* Compl. at ¶ 241; JA___.

## B.    The Natural Gas Act

Natural Gas Act grants the Commission jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce. 15 U.S.C. § 717(b) and (c); *see generally Oneok, Inc. v. Learjet, Inc.*, 135 S.Ct. 1591, 1596 (2015). Under Natural Gas Act section 7(c), any person seeking to construct or operate a facility for the transportation or sale of natural gas in interstate commerce must secure a Certificate from the Commission. 15 U.S.C. § 717f(c)(1)(A).

## C.    The Funding Mechanism

DRN alleges that the Funding Mechanism for the Commission's natural gas pipeline program creates a perverse incentive structure for the Commission to be biased in favor of the pipeline companies that it regulates. *See* 42 U.S.C. § 7178(a)(1).

Section 7178(a)(1) states, in full, "the Federal Energy Regulatory Commission shall, using the provisions of this section and authority provided by other laws, assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year." *Id.*

For the natural gas pipeline program, the Commission annually compares the amount of gas each company transports to the total amount transported by all jurisdictional gas pipeline companies, then calculates and imposes a proportional volumetric charge on each company. *See* 18 C.F.R. § 382.202. Therefore, the Commission's natural gas pipeline program budget is not funded by a traditional Congressional appropriation, but instead is sourced from the private companies that it regulates.

The natural gas pipeline program comprises roughly twenty percent of the Commission's overall budget. *See Compl.* ¶ 83 *(citing Congressional Performance Budget Request: Fiscal Year 2016*, Chairman Cheryl A LaFleur, at iii); JA___. Over the last decade the Commission has seen its annual budget grow by an astonishing fifty-one percent, rocketing from sub-$200-Million in 2004 to a more

6

than $300-Million in 2014. *See* Compl. at ¶ 157; JA___. The Commission's budget has grown by more than double the rate of its parent government agency, the Department of Energy, which grew roughly twenty-two percent during the same time period. *Id*. at ¶ 158; JA___.

The Commission was not always funded by the industry that it regulates. Prior to 1987, the Commission did not have the authority to assess charges on regulated companies for the work the Commission performed in regulating natural gas pipelines. *Id*. at ¶¶ 77-78; JA___. The Commission's self-interest in the Funding Mechanism is manifested by the fact that the Commission itself requested legislation to authorize the Commission to cover its entire budget by assessing annual charges on the companies subject to its regulation, which was ultimately granted in the Omnibus Budget Reconciliation Act of 1986. *Id*. at ¶ 79; JA___.

### D.    The PennEast Pipeline Project

On September 24, 2015 PennEast Pipeline Company filed its application for a Certificate from the Commission. *See* Compl. ¶ 87; JA___. The PennEast project is a proposal to construct a 114-mile, 36-inch diameter pipeline through Pennsylvania and New Jersey. *Id*. ¶¶ 89-90; JA___. This new greenfield pipeline is proposed to provide up to 990,000 dekatherms per day of natural gas transportation capacity to the market on a year-round basis. *Id*. at ¶ 89; JA___. The Project would cut through Luzerne, Carbon, Northampton, and Bucks Counties in Pennsylvania

7

and Hunterdon and Mercer Counties in New Jersey. *Id*. at ¶ 90; JA___. As proposed, the Project would disturb over 2,400 acres of land, convert over 400 acres of forested land to open land, cross 234 waterbodies, and impact over seventy-four (74) acres of wetlands. *Id*. at ¶ 91; JA___.

On April 7, 2017, the Commission issued an Environmental Impact Statement ("EIS") for the Project. The Commission has never voted to deny a Certificate to a natural gas pipeline project where an EIS has been issued. *Id*. at ¶ 179; JA___.

## STANDARD OF REVIEW

This Court reviews the District Court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) or for failure to state a claim under 12(b)(6) *de novo. El Paso Natural Gas Co. v. United States*, 750 F.3d 863, 874 (D.C. Cir. 2014). On a motion to dismiss for lack of subject matter jurisdiction, the Court must accept as true the facts alleged by the non-moving parties. *Schnitzer v. Harvey*, 389 F.3d 200, 202 (D.C. Cir. 2004).

## SUMMARY OF THE ARGUMENT

The District Court dismissed the Complaint on the following bases: 1) that DRN does not enjoy a liberty or property interest that are protected by due process in the Commission's approval process; and 2) the Funding Mechanism, as a matter

of law, does not support a biased adjudicator claim. *See Riverkeeper*, 243 F.Supp.3d at 152-154. These holdings were in error.

DRN has genuine liberty and property interests that are subject to deprivation without due process because the Funding Mechanism creates an undue incentive for the Commission to approve natural gas pipeline projects. Contrary to the District Court's holdings, DRN's liberty and property interests are well-grounded in Pennsylvania constitutional law. The District Court rejected DRN's liberty interest claim by holding that the Pennsylvania Constitution's Environmental Rights Amendment does not provide a basis for recognizing individual environmental rights in Pennsylvania. The Pennsylvania Supreme Court's decisions in *Robinson Tp., Washington County v. Com.*, 83 A.3d 901 (Pa. 2013) (hereinafter referred to as "*Robinson II*"), and *Pennsylvania Environmental Defense Foundation v. Commonwealth*, 161 A.3d 911 (Pa. 2017) (hereinafter referred to as "*PEDF*") (a decision issued subsequent to the District Court's decision) control this question and are directly counter to the District Court's holding.

Further, the District Court suggested that DRN's members can obtain judicial relief of due process violations in the separate eminent domain proceedings initiated by pipeline companies. However, it is well-established that the courts will not entertain such attacks on the legal validity of Certificates, and instead

9

specifically limit the issues to be addressed to a facial consideration of whether the pipeline company has obtained a Certificate, and how much compensation is due. As such, the District Court failed to acknowledge that those who have had their due process rights violated as a result of bias, or the appearance of bias, simply have nowhere else to seek relief, but here.

The District Court also incorrectly held, as a matter of law, that the Funding Mechanism does not support a biased adjudicator claim. The Commission's structural bias clearly arises out of the Funding Mechanism, which creates a perverse incentive structure, or the appearance of a perverse incentive structure, for the Commission to be biased in favor of approving pipeline projects. *See, e.g.*, Compl. at ¶¶ 1-8; JA___. The Commission's entire natural gas pipeline program is sourced from the private companies that it is tasked with regulating. The Commission therefore has a significant institutional interest in becoming partners with, rather than regulators of, the natural gas pipeline industry.

Further, the District Court failed to address DRN's separate claim of a due process violations vis-à-vis "tolling orders" that the Commission issues. *See* Compl. at ¶ 209; JA___. Aggrieved parties opposing the Commission's approval of a pipeline Certificate must submit rehearing requests to the Commission, and the Commission must deny or grant the rehearing request before the aggrieved party may appeal the Commission's decision to the appropriate Circuit Court. *Id*. at ¶¶

10

192-193; JA___. However, instead of acting on the rehearing requests the Commission issues "tolling orders," and then takes no action on the rehearing requests for months or longer while simultaneously issuing letter orders authorizing various types of construction activity. *Id*. at ¶¶ 194-196; JA___. Such unconstitutional action prevents aggrieved parties from obtaining timely and effective judicial review prior to irreparable harm to the environment taking place. *Id*. at ¶ 209.

## ARGUMENT

### I.    DRN States a Claim Upon Which Relief can be Granted

At the pleading stage, the issue before the court is not whether plaintiffs have established sufficient proof of its harms, but whether plaintiffs have adequately pled their claims. *See Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 403 F.3d 1249, 1253 (D.C. Cir. 2005). While the court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss, *see Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992), the court must "accept all of the factual allegations in [the] complaint as true." *United States v. Gaubert*, 499 U.S. 315, 327 (1991) (internal quotation marks omitted).

### A.    Article I, Section 27 of the Pennsylvania Constitution Provides a Property and Liberty Right that Sustains Plaintiffs' Due Process Claim

The District Court erred in its conclusion that the Pennsylvania Constitution's Environmental Rights Amendment does not create property or liberty interest that is afforded due process protection. *See Riverkeeper*, 243 F.Supp.3d at 152-53. Pennsylvania's Constitution is unique in recognizing the people's individual liberty and property rights to a healthy environment. The rights stated in Article I, Section 27 are placed among the "'inherent and indefeasible' rights" set forth in Article I, which is the Declaration of Rights section of the Pennsylvania Constitution. *PEDF*, 161 A.3d at 931 (Pa. 2017) (quoting Pa. Const. art. I, § 1). The Declaration of Rights contains those rights that the people of Pennsylvania sought "[t]o guard against the transgressions of the high powers which we have delegated" in the other Articles of the Pennsylvania Constitution. Pa. Const. Art. I, § 25; *Robinson II*, 83 A.3d at 948-49 (Pa. 2013); *PEDF*, 161 A.3d at 931. Everything in Article I, including Section 27, "is excepted out of the general powers of government and shall forever remain inviolate." Pa. Const. Art. I, § 25. In other words, the people did not delegate to government the authority to trample on their inherent rights protected by Article I. *Robinson II*, 83 A.3d at 947-48 (plurality); *see also PEDF*, 161 A.3d at 931.

Section 27 states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the

12

people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, § 27.

The rights Section 27 protects are on par with the other rights in Article I, and the people of Pennsylvania knowingly placed these rights among their other most sacred political and individual rights. *PEDF*, 161 A.3d at 911 (the people of Pennsylvania voted to make their environmental rights "commensurate with their most sacred political and individual rights"; *A Legislative History of Article I, Section 27 of the Constitution of the Commonwealth of Pennsylvania*, 24 Widener L.J. 181, 270 (Widener Compilation, at 7 (House Journal at 486), at 66 (Q&A to Voters) (gives Pennsylvanians a "fundamental legal right to a decent environment")); 1970 Legislative Journal—House, at 2272 (quoting Kury); *Robinson II*, 83 A.3d at 948; 953-54, 962. These other rights include property rights; the right to free speech and the press; the right to worship as one pleases; the individual right to privacy; the right to bear arms; and the right to life, liberty, the pursuit of happiness. Pa. Const. Art. I, §§ 1, 3, 7, 8, 21. Article I represents an express statement by the people of their fundamental rights. *Robinson II*, 83 A.3d at 947-49 (plurality); Pa. Const. Preamble of Article I; art. I, § 25); *PEDF*, 161 A.3d at 931. This is no different for Section 27, which is particularly rooted in the Commonwealth's specific history. *PEDF*, 161 A.3d at 911, 912-13 (quoting

13

*Robinson II*, 83 A.3d at 960-63).  Thus, all of Article I, including Section 27, sets forth fundamental rights.

As the Pennsylvania Supreme Court's recent decision in *PEDF* confirms, Section 27 protects two sets of rights, one that is set forth in the first sentence of the provision, and the second that is described in the second and third sentences. *PEDF*, 161 A.3d at 931 ("This constitutional provision grants two separate rights to the people of this Commonwealth."); *see also id*. at *21 (Baer, J., concurring)("I agree with the plurality in *Robinson Township* and the Majority in the case at bar that Section 27 contains two enforceable rights").

> The first right is contained in the first sentence, which is a prohibitory clause declaring the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic and esthetic values of the environment. *Robinson Twp.*, 83 A.3d at 951.

*Id. at 931*; *see also* 940 (Baer, J., concurring).

> The second right reserved by Section 27, set forth in its second sentence, is the common ownership by the people, including future generations, of Pennsylvania's public natural resources. *Id.* at 954.

> . . . The third clause of Section 27 establishes a public trust, pursuant to which the natural resources are the corpus of the trust, the Commonwealth is the trustee, and the people are the named beneficiaries. *Robinson Twp.,* 83 A.3d at 955–56.

14

*PEDF*, at 931-32; *see also* 940 (Baer, J., concurring). For ease of discussion, DRN will refer to the first sentence as the individual environmental rights clause, and the second and third sentences as the public trust clauses.

### i.    Section 27 Creates an Individual Right

Article I Section 27 creates a right personal to each citizen, and not merely a public right. The Court below was therefore incorrect when it held that the rights found in Section 27 are only a collective protection or public right. *Riverkeeper*, 243 F.Supp.3d at 152-53.

Each clause in Section 27 uses the phrase "the people." Pa. Const. Art. I, § 27; *Robinson II*, 83 A.3d at 951 & n.39. As *Robinson II* explained:

> The only other constitutional provision similarly formulated is interpreted to guarantee a constitutional right personal to each citizen. *Compare* Pa. Const. art. I, § 27 with Pa. Const. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures...."); *see, e.g., Commonwealth v. Russo,* 594 Pa. 119, 934 A.2d 1199 (2007) (criminal defendant's evidentiary challenge premised upon Section 8 of Article I); *Edmunds,* 586 A.2d at 898 (unlike federal counterpart, Article I, Section 8 analysis premised, *inter alia,* upon individual right to privacy); *accord* 1970 Pa. Legislative Journal–House 2269, 2273 (April 14, 1970) (first clause of Section 27 affirms constitutional right "in individual citizens").

*Id.* at 951 n.39 (plurality). Thus, the rights Section 27 protects are not just a collective protection, or, as the Court below and PennEast claimed, a public right.

Rather, Section 27 embodies each individual's right to a healthy environment in which to live, and each individual's rights to enjoy the people's commonly-held public natural resources -- including the rights of generations of Pennsylvanians yet to come.   Section 27 reflects Pennsylvanians' individual connections, and inextricable link, to our environment -- including our air and water -- are not something separate and apart from humans, but something that we depend on for our survival, our quality of life, sense of place and meaning, and our livelihoods. *Robinson II*, 83 A.3d at 975; 1970 Legislative Journal – House at p.2271.

This is consistent with Section 27's legislative history,[1] and how fundamental rights enshrined in the Declaration of Rights (and similar protective mechanisms, like the federal Bill of Rights) are construed.

---

[1] The Pennsylvania Supreme Court has counseled:

> In interpreting constitutional language, "the fundamental rule of construction which guides [this Court] is that the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption." *Ieropoli v. AC & S Corp.*, 577 Pa. 138, 842 A.2d 919, 925 (2004). As with our interpretation of statutes, if the language of a constitutional provision is unclear, we may be informed by "the occasion and necessity for the provision; the circumstances under which the amendment was ratified; the mischief to be remedied; the object to be attained;

16

The legislative history leading up to the overwhelming voter approval of Section 27 is replete with references to Section 27 creating individual rights, particularly in regard to clause 1 of Section 27 (the individual environmental rights clause).  For example, Rep. Franklin Kury -- the primary sponsor and proponent of Section 27 -- stated:

> The bill, an amendment to our state constitution, would amend our declaration of rights, to provide that *every* citizen has a right to clean air, pure water, and the natural, scenic, historic and esthetic qualities of our environment. The proposal further declares that the natural resources of Pennsylvania belong to all the people and that the state government, as trustee of our natural resources, must protect them for the benefit of everyone, including unborn generations.

24 Widener L.J. 181, 197 (Widener Compilation, p.15 (Kury) (emphasis added)).

Further, in a Question and Answer sheet he developed for voters, he stated the following:

> Q. Will Joint Resolution 3, if passed, benefit individual citizens personally?
>
> A. Yes.  At present **individual** citizen's [sic] legal rights in the environment are basically limited to protecting their property or person from actual or threatened damage.  Joint Resolution 3 broadens these legal rights to include a legally protectable

_____

and the contemporaneous legislative history." *Robinson Twp*., 83 A.3d at 945 (*citing* 1 Pa.C.S. §§ 1921, 1922).

*PEDF*, 161 A.3d at 929-30.

17

> interest in the whole environment – including the
> water we drink, the air we breathe, and the
> esthetics of the landscape.

*Id*. at 272 (Widener Compilation, at p.68 (Q&A to Voters) (emphasis added)).

As part of the legislative history, Representative Kury also inserted a legal analysis by a law professor, which stated, in part: "The first sentence creates (or affirms) a positive constitutional right in individual citizens. The second and third sentences impose the public trust doctrine upon the 'public natural resources' of Pennsylvania." 1970 Pa. Legislative Journal–House 2269, 2273 (April 14, 1970) (Broughton analysis).

In addition to the controlling precedent in *PEDF* and *Robinson II*, there is clear scholarly support for recognizing Section 27 clause 1 as protecting individual rights is not an outlier. Professor John Dernbach, the leading scholar on Section 27 has stated:

> Protected Persons.--Because the environmental rights clause applies to "[t]he people," all Pennsylvania residents appear to be protected. The environmental rights sentence in Article I, Section 27 focuses on the specific environment where people live, work, and play. .
> . . .
>
> In addition, "the people" hold these rights on equal terms **as individuals**. This principle is considered true of all legal rights; any individual or group that is deprived of legal rights is entitled to judicial relief. The distribution of environmental benefits and burdens is thus squarely

18

> within the reach of the Amendment. The values identified
> in the first sentence are not meaningfully or legally
> protected **if some people enjoy them and others do not.**

John C. Dernbach, *Taking the Pa. Constitution Seriously When it Protects the Environment: Part II – Environmental Rights and Public Trust*, 104 Dickinson L. Rev. 97, 142-43 (1999) (emphasis added).

The public trust clauses of Section 27 also protect individual rights. The property right contained within Section 27 is the **right of each Pennsylvanian** to use and enjoy the public natural resources that they own in common with other Pennsylvanians and future generations, and the Commonwealth is entrusted with management over this property right.  In other words, each citizen has common ownership, and each citizen has the right to benefit from that ownership.  And that is a right personal to each citizen that the government may not infringe upon. Indeed, *PEDF* made clear that the Commonwealth, as trustee, is bound by fiduciary duties such as prudence, loyalty, and impartiality.  The duty of impartiality means that the trustee must treat the beneficiaries **equitably** in light of the purposes of the trust.  This means that the trustee cannot favor some beneficiaries (current residents and future generations) over others, because that would diminish the disfavored beneficiaries' right to use and enjoy their commonly-held natural resources.

1885588.1/50442

The ruling in the Court below does not recognize this duty, as that Court's reading of Section 27 is that there is no individual aspect or consideration in a public right. This reading of Pennsylvania's Constitution would make Section 27's duty a dead letter and is directly contrary to the Pennsylvania Supreme Court's holdings in *PEDF*, *Robinson II* and to the text of Section 27 itself.

*PEDF* and *Robinson* recognized that citizens can enforce Section 27 against the government, and that is why the citizens put the provision in the Constitution in the first place – because the Commonwealth's history of repeated environmental degradation for a select private group to benefit (while everyone else bore and still bears the burdens of that) counseled the people that they had to have the final check over their government. *PEDF*, 161 A.3d at 911-913 (quoting *Robinson II*, 83 A.3d at 960-63). By being in Article I, the Environmental Rights Amendment says that the citizens have the inherent right to a healthy local environment which the government has no authority to infringe upon. In Pennsylvania, this is no different than religious liberty, free speech, the right to privacy, or the right to bear arms.

The legislative history demonstrates that the Court's view threatens the very meaning of Section 27 as the people intended. Examples of such clear statements of enforceability by individual citizens include the following:

> The proposed amendment would immediately create rights to prevent the government (state, local, or an

20

> authority) from taking positive action which unduly
> harms environmental quality . . . .

1970 Legislative Journal – House at 2281 (Broughton analysis).

> The first sentence of this constitutional amendment
> grants to the people a clearly enforceable constitutional
> right to: (1) clean air and pure waters, and (2)
> preservation of the natural[,] scenic, historic and esthetic
> values of the environment.

1970 Legislative Journal – House, p. 2272.

In *Robinson II*, the plurality saw these same aspects apparent in the plain

language of Section 27.

> This Court perceives no impediment to citizen
> beneficiaries enforcing the constitutional prohibition in
> accordance with established principles of judicial review.

*Robinson II*, 83 A.3d at 957.

> The Commonwealth's obligations as trustee to conserve
> and maintain the public natural resources for the benefit
> of the people, including generations yet to come, create a
> right in the people to seek to enforce the obligations.
> *See Commonwealth ex rel. Logan v. Hiltner,* 307 Pa. 343,
> 161 A. 323, 325 (1932) ("It is a settled rule of
> constitutional construction that prohibitive and restrictive
> provisions are self[-]executing and may be enforced by
> the courts independently of any legislative
> action."); *accord Payne,* 361 A.2d at 272 (Environmental
> Rights Amendment creates public trust and names
> Commonwealth trustee; "[n]o implementing legislation is

21

> needed to enunciate these broad purposes and establish
> these relationships; the amendment does so by its
> own *Ipse dixit*.").

*Robinson II*, 83 A.3d at 974.

These Pennsylvania Supreme Court decisions played no role in the lower Court's analysis, and indeed, the District Court's analysis is directly contrary to the basic principles and statements of Section 27 as explained in *PEDF* and *Robinson II*.

### ii.    Section 27 Recognizes Environmental Rights as a Liberty Interest on par with Political Freedoms

The lower Court held that no liberty interest is at stake, contrasting environmental rights to rights such as marriage and reproductive choices, and the right to live in the United States.  This is clearly contrary to the Pennsylvania Constitution itself, and particularly the Declaration of Rights in Article I.  Section 27, by its presence in the Declaration of Rights, is among the "the general, great and essential principles of liberty and free government" that the people, via Article I "recognized and unalterably established." Pa. Const. art. I, preamble.  Indeed, Section 27 -- like the people's religious freedoms, right to bear arms, and right to free speech -- excepted out of the general powers of government and shall forever remain inviolate." Pa. Const. art. I, § 25.

1885588.1/50442

In order for other components of our liberty interests to be truly meaningful, a healthy environment is the necessary backdrop. Science is replete with examples of the negative human health effects of environmental degradation. The right to choose to raise a family is not as meaningful if the same level of protection is not given to the environment in which we raise our families, including meeting their most basic needs of clean air, clean air, and healthy food from the earth.

In the same way, a person cannot truly enjoy their freedom from physical restraint or right to live in the United States if the air around their homes is so polluted that they cannot recreate outside. This is the reality for many who live in industrialized urban areas, petrochemical industrial zones, or in the shalefields, and who suffer from health conditions either due to pollution or which are made worse by pollution. Not only does it keep people from enjoying their lives to the fullest, but it also diminishes their use and enjoyment of their property -- another protected right.

The declarations DRN submitted below further illustrated the types of harms to local environment that the Commission's pipeline approvals cause and can be expected to cause. These harms include: home damage; damage to and ultimately, destruction of investments in agricultural operations; water supply impacts; disruptions to daily life and the investments people have made in their local environment (including their own properties); noise impacts; ecological

23

destruction; visual impacts including through destruction of forested areas and buffers; destruction of geologic and archeologic resources; wildlife disruption and habitat loss; and still other harms. (*See, e.g.*, Farrell Declaration (entire); JA___; Nelson Declaration, ¶¶ 13, 16-40; JA___; Heindel Declaration, ¶¶ 6-26; JA___). Damage to water supplies, agricultural lands and operations, archeologic, aesthetic, and natural aspects of the local environment around people's homes (including wildlife impacts) all implicate residents' rights to a healthy local environment in addition to their private property rights. It is self-evident that building more pipelines fuels more shale gas development, including extraction and burning of natural gas, -- harming still more Pennsylvanians and their right to a healthy place in which to live.

As the Environmental Rights Amendment's lead legislative sponsor stated,

> "The real capital" of the Nation and of our State is its God-given natural resources. The conservation amendment we offer today will, I believe, establish a proper sense of stewardship over that "real capital" here in Pennsylvania. It will provide a firm governmental foundation on which we can act to assure our survival on our small corner of this planet.

24 Widener L.J. 181, 191 (Widener Compilation, p.7 (Kury)).

> It is well accepted that the good society, a society of free men in a free world, requires an appropriate political environment and physical environment. The political environment we have achieved. The physical environment we must yet save. Therefore, let us pass

24

this bill and give constitutional protection to the greatest
wealth Pennsylvania has—its natural resources.

*Id*. at 196 (Widener Compilation, p. 15 (Kury)).

In *Robinson II*, the Pennsylvania Supreme Court plurality opinion reinforced this understanding that a healthy local environment is fundamental to life and liberty.

> The public natural resources implicated by the "optimal" accommodation of industry here **are resources essential to life, health, and liberty**: surface and ground water, ambient air, **and aspects of the natural environment in which the public has an interest**. As the citizens illustrate, development of the natural gas industry in the Commonwealth unquestionably has and will have a lasting, and undeniably detrimental, impact on the quality of these core aspects of Pennsylvania's environment, which are part of the public trust.

*Id.* at 975 (plurality) (emphasis added).  Further, both *Robinson II* and *PEDF* recognized that the people's placement of Section 27 in Article I demonstrates that environmental rights are fundamental, inherent rights of humankind, just as freedom of speech and other protected rights are. *PEDF*, 161 A.3d at 911 (the people of Pennsylvania voted to make their environmental rights "commensurate with their most sacred political and individual rights."); *Robinson II*, 83 A.3d at 947-49; 953-54, 962; *see also* Pa. Const. Preamble of Article I; art. I, § 25; 24 Widener L.J. 181 (Widener Compilation, at 7 (House Journal at 486), at 66 (Q&A

25

to Voters) (gives Pennsylvanians a "fundamental legal right to a decent environment")); 1970 Legislative Journal—House, at 2272 (quoting Kury).

### iii.    Pennsylvania Courts have Found Section 27 Confers Specific Liberty and Property Interests

The District Court also claimed that Section 27 was too vague to confer a property interest, comparing a constitutional provision in a state constitution protecting fundamental right to a statutory one.  The Pennsylvania Supreme Court has soundly rejected the view that Section 27 is merely a policy directive or too vague to mean much.

First, in *Robinson II*, a majority of the Pennsylvania Supreme Court determined that there are judicially-manageable standards that courts can use to adjudicate Section 27 claims, rejecting the application of the political question doctrine.  In so doing, the Court clearly stated:

> Organic constitutional provisions on which the citizens rely offer, as will become evident in our later discussion, the type of judicially discoverable and manageable standards by which courts are able to measure and resolve the parties' dispute without overstepping the Judiciary's own constitutional bounds.

*Robinson II*, 83 A.3d at 929 (majority).

Second, both *Robinson II* and the recent *PEDF* decision make very clear that the standards for Section 27 violations are set forth **in the language of the provision itself**, along with Pennsylvania trust law at the time of Section 27

26

enactment in 1971. *Robinson II*, 83 A.3d at 951-52, 953 (clause 1); 955-59 (public trust clauses) (plurality); *see also* plurality's application to Act 13 (public trust); *PEDF*, 161 A.3d at 931; *see also id*. at \*931-36, and Court's application to the challenged legislation. Indeed, the Supreme Court has now struck down two laws based on Section 27, belying the belief that Section 27 is somehow too vague.

The District Court made the same error that the Pennsylvania Supreme Court has rejected past caselaw for doing -- failing to conduct a principled analysis of the rights protected by Section 27, and their standards, separately. *PEDF*, 161 A.3d at 930 n.20 (quoting and discussing *Robinson II*, 83 A.3d at 967; \*13 (all discussing *Payne v. Kassab*, 312 A.2d 86 (Pa. Commw. Ct. 1973), and overruling use of the *Payne* three-prong test for Section 27 analysis, which was specifically relied upon in the District Court's Opinion); *see also Robinson II*, 83 A.3d at 966-67 & n.53 (plurality).

## B.    DRN's Members' Real Property at Stake is not Protected Via Eminent Domain Jurisprudence

The District Court rejected DRN's assertion that its members have a property interest at stake on the basis that their properties will be subject to eminent domain proceedings when the Commission issues the Certificate for PennEast. *Riverkeeper*, 243 F.Supp.3d at 153. The District Court posited that eminent domain proceedings have "generated their own due process jurisprudence" and that the "real property at stake in potential subsequent eminent domain

27

proceedings does not constitute a protected property interest granting the Plaintiffs additional, pre-eminent domain due process rights during the certificate approval stage." *Id*. However, this conclusion fundamentally misunderstands the scope of judicial review at the eminent domain proceedings stage for natural gas pipeline projects.

The Natural Gas Act provides that any holder of a Certificate of Public Convenience may acquire property "by the exercise of eminent domain in the district court." 15 U.S.C. § 717f(h); *E. Tenn. Nat'l Gas Co. v. Sage*, 361 F.3d 808, 822 (4th Cir. 2004). Once a project applicant obtains a Certificate from the Commission the project applicant has "the ability to obtain automatically the necessary right of way through eminent domain, with the only open issue being the compensation the landowner defendant will receive in return for the easement." *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Tp., York County, Pa., Located on Tax ID #440002800150000000 Owned by Brown*, 768 F.3d 300, 304 (3d Cir. 2014).

The District Court's role in this context is narrowly limited to evaluating the scope of the Certificate, and to ordering condemnation of property as authorized in the Certificate. *See Williams Natural Gas Co. v. Oklahoma City*, 890 F.2d 255, 262 (10th Cir. 1989) ("Judicial review . . . is exclusive in the courts of appeals once the FERC certificate issues"). In other words, in the context of eminent domain

28

proceedings courts **will not** consider the validity of the Certificate or whether due process rights were violated by the Commission's review process. *See also Transcontinental Gas Pipe Line Company, LLC v. Permanent Easement for 2.14 Acres*, 2017 WL 3624250, at *5 (E.D. Pa., August 23, 2017) (specifically rejecting plaintiffs' due process claims against the Commission because the court "did not have jurisdiction to consider [plaintiffs'] constitutional arguments"). As such, it is here, and only here, where DRN and its members can obtain relief from due process violations that result in an automatic condemnation of their property.

### C.    The Commission is an Unconstitutionally Biased Adjudicator, or Appears to be an Unconstitutionally Biased Adjudicator

The District Court erred in dismissing, as a matter of law, DRN's claim that the Commission has become of voice and partner of the industry it regulates because its budget is directly connected to, and indeed relies upon, the survival and proliferation of the industry it regulates. The Commission is a uniquely self-financing independent executive agency reliant on the private companies it regulates to supply the entirety of its budget, roughly twenty percent of which is dedicated the natural gas regulatory program. *See* Compl. at ¶ 7; JA___. As a result of this funding structure, DRN states a cognizable claim that the Commission staff and its Commissioners are subject to unconstitutional bias in their decision-making regarding the approval of new jurisdictional pipeline projects.

### i.    Legal Standard for Adjudicator Bias

29

The Commission's entire natural gas program budget is reliant upon both the willingness and ability of pipeline companies to build, operate, and pay user fees for new and existing projects. *See, e.g.*, Compl. at ¶¶ 6-7, 142; JA___. As such, the Commission faces an unconstitutional "possible temptation" to use their adjudicative powers in their own self-interest to approve an ever-growing number of pipelines from which the Commission sources its budget. *Id*. at ¶¶ 116-140; JA___.

Constitutional due process requires fair adjudicative proceedings before neutral and detached decision-makers. *See Ward v. Village of Monroeville*, 409 U.S. 57, 59-60 (1972). Due process stands violated when a decision-maker faces "a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). When an agency adjudicates, due process is offended when "the decision-maker, because of [its] institutional responsibilities, would have so strong a motive to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau Chapter Housing Authority v. City of Berkley*, 114 F.3d 840, 844 (9th Cir. 1997) (internal quotation omitted). Agencies may not operate pursuant to a "dual status as judge and a party interested in the outcome of the proceedings." *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 699 (7th Cir. 1982).The adjudicator's stake in the relevant proceedings need not be "direct or positive" to violate due process.

30

*Gibson v. Berryhill*, 411 U.S. 564, 579 (1973). The "possible temptation" standard "applies with equal force to… administrative [agencies]." *Id*. at 579.

Additionally, while the Constitution clearly mandates that adjudicative proceedings be free of actual bias, it is also well-established law that the Constitution forbids the appearance of bias in adjudications. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("[O]ur system of law has always endeavored to prevent even the probability of unfairness"); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246-7 (D.C. Cir. 1971) ("With regard to judicial decisionmaking, whether by court or agency, the appearance of bias or pressure may be no less objectionable than the reality"); *see also Ungar v. Sarafite*, 376 U.S. 575, 588 (1964) (an adjudicator should be disqualified for "bias, [ ] a likelihood of bias[,] or [even] an appearance of bias"); *Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias"). While the probability of unfairness or the level at which an adjudicator's interest in a matter becomes constitutionally improper "cannot be defined with precision," courts have explained that the appearance of bias is so abhorrent to constitutional due process that it may even bar judges or adjudicatory bodies "who have no actual bias and who would do their very best to weigh the scales of justice equally

31

between contending parties . . . To perform its high function in the best way justice must satisfy the appearance of justice." *Murchison*, 349 U.S. at 135.

###    ii.    Pipeline Approvals Result in Direct and Substantial Benefits to the Commission

Every single dollar that flows into the Commission's natural gas program budget is the byproduct of gas that flows through a Commission-approved pipeline project. *See* Compl. at ¶ 6; JA___. There is not a single natural gas pipeline company that operates a Commission-jurisdictional project which does not pay user fees that ultimately fund the Commission's budget. Indeed, the companies by statutory mandate have no choice but to do so. *Id*. at ¶ 4; JA___. It is therefore axiomatic that the more pipeline projects that the Commission approves, the larger the pool of resources is for the agency to access via its annual charges. *Id*. at ¶¶ 125-127; JA___. The Funding Mechanism necessarily increases the money available to the Commission thereby conferring upon the Commission a number of discreet and substantial benefits.

The District Court based its decision finding no unconstitutional bias on the premise that the "Commission's budget cannot be increased by approving pipelines; rather, 42 U.S.C. § 7178 requires the Commission to make adjustments to 'eliminate any overrecovery or underrecovery.'" *Riverkeeper*, 243 F.Supp.3d at 154. However, this framing of the issue mischaracterizes DRN's claims, and fails to confront the core constitutional infirmities of the Funding Mechanism. Indeed,

32

DRN specifically recognized that the revenue the Commission collects may offset its appropriation; however, that does not negate, or even mitigate, the specific direct benefits of the Commission's pipeline approvals. *See* Compl. at ¶ 67; JA___.

The District Court specifically found that "[u]nlike the agencies in *Tumey*, *Ward*, and *McClure*, FERC stands to gain no direct benefit from the approval of a particular pipeline project." *Riverkeeper*, 243 F.Supp.3d at 154. This statement is in error for at least two reasons. First, the relevant caselaw does not support the Court's conclusion. For example, in *Ward* the Supreme Court did not find that the significance of the benefits derived from any individual biased adjudication violated due process; rather, the Supreme Court held that a structural conflict of interest inherent in the adjudicatory process itself violated due process. *See Ward*, 409 U.S. at 60 (1972). Specifically, the Supreme Court concluded in *Ward* that the additive effect of adjudicating all of the traffic fines collectively violated due process, and that the single fifty-dollar traffic fine that was the subject of the case was merely symptomatic of a greater constitutional problem. *Id*. The same principle applies to other cases finding structural bias. *See, e.g.*, *Gibson*, 411 U.S. 564 (1973); *United Church*, 689 F.2d at 699. Similarly, the Commission's possible temptation of bias -- or appearance of bias -- is a result of the additive effect of the Commission's collective interest in approving pipeline project applications as a whole.

33

The District Court also failed to address the consequences of a funding structure that incentivizes the certification of unnecessarily pipeline projects. The District Court relied on the premise that if the Commission "does not approve any one project, its budget remains the same, with the proportional volumetric charge per gas company being slightly higher." *Riverkeeper*, 243 F.Supp.3d at 154. However, DRN does not argue that a failure to approve any one project would change the Commission's budget in the short-term; rather, DRN asserts that "[t]he more pipeline projects that the Commission approves, the more 'product' the Commission can tap for funding." *See* Compl. at ¶ 126; JA___. In other words, approving additional -- and potentially unjustified -- pipelines allows the Commission's budget to be spread across a greater revenue base, which results in a number of **direct and substantial benefits** to the agency.

For example, the Commission's entire natural gas regulatory program -- which includes lawyers, engineers, scientists, and support staff -- is reliant on the collection of the annual charges from pipeline companies. The salaries, **and salary increases**, for each of these employees primarily depends on a growing long-term revenue base from which the Commission can source its budget now and in the future.

As such, the Commissioners themselves, and the staff who make recommendations to the Commissioners on approving certifications for pipelines,

34

have a significant interest in facilitating a diversified, stable, and continuing long-term source of funding. This is especially true here because while the Commission collects funds for its budget from three other industries, the Commission cannot shift money to cover employees in the natural gas program in the event of a shortfall. *See* 18 C.F.R. §§ 382.201-03. While the Commissioners' terms are statutorily limited, there is no question that they each have a vested interest in leaving the agency in a better financial position than when they began. Certainly, the Commission's natural gas program staff also have an interest in the continuing existence of the program, and have no statutorily limited terms. Indeed, "[a] bureaucracy, protecting its turf and cherishing the number of its employees and the extent of its empire, can have as lively a bias towards its budget as any old-fashioned venal politician might have in his pocketbook." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1309 (9th Cir. 2003) (Noonan, J., concurring).

Additionally, because this case was dismissed at the motion to dismiss stage, there has been no opportunity for discovery on the relationship between the Commission staff's salary, bonuses, or pay increases with regard to pipeline approvals. For example, to the extent there exist salary or bonus pay structures that are based or related to the number of pipeline applications reviewed or approved, this would be a significant financial conflict of interest in violation of due process. Similarly no discovery was taken regarding the pay structure of the Commissioners

35

themselves, and/or any pro-quid quo representations made to the Commissioners via any industry lobbying efforts. *See* Lombardi, Kristen; Hopkins, Jamie, *Natural Gas Building Boom Fuels Climate Worries, Enrages Landowners*, July 17, 2017, available at: https://www.publicintegrity.org/2017/07/17/20982/natural-gas-building-boom-fuels-climate-worries-enrages-landowners (last visited September 25, 2017) (Between mid-2010 to 2016 "[l]arge energy companies . . . scheduled at least 93 meetings with FERC officials" and "[t]rade . . . wooed commissioners and staff with invitations to executive dinners and after-hours parties. . . By contrast, records show, FERC commissioners met with environmental and public-interest groups 17 times over this period").

A second but related direct benefit of approving pipelines, regardless of their merit, is that each approval necessarily represents a predictable long-term revenue source which allows the Commission to engage in long-term strategic thinking and budget planning with a degree of certitude that no other agency enjoys. It is beyond peradventure that such commitments of funds confer a singularly unique benefit that is far more significant than the single one-time payoffs that were present in *Ward*. As such, the Commission has a structural interest in approving projects as long as they can be shown to be economically viable.

Ultimately, the reasons for which the Commission has such a strong institutional interest in approving natural gas pipeline projects are analogous to the

36

well-established institutional interests that all types of government institutions have in increasing their tax bases. *See* Tax Base, Black's Law Dictionary (10th ed. 2014) ("1. The total property, income, or wealth subject to taxation in a given jurisdiction. 2. The aggregate value of the property being taxed by a particular tax"). Indeed, it is self-evident that there are numerous over-arching benefits from enlarging an institution's tax base, beyond simply adding revenue, including increased stability, growth, and the quality of services provided. The same can be said for the Commission and the distinct benefits it enjoys vis-à-vis pipeline approvals.

Additionally, it is beyond serious dispute that the Commission takes full advantage of the benefits derived from its ability to increase its revenue base, as the Commission enjoys the unique luxury of making financial plans well beyond merely the immediate fiscal year. In fact, as a result of its growing funding base, the Commission has and does have plans for at least five years ahead. For example, in its "FY2009-2014 Strategic Plan," the Commission advances several long-term initiatives, like its desires to "recruit, hire, train, motivate and retain qualified staff," and "continue to upgrade its own infrastructure in order to achieve its strategic goals." *See* http://www.ferc.gov/about/strat-docs/FY-09-14-strat-plan-print.pdf (Commission FY2009-2014 Strategic Plan). Indeed, the agency's implementation of its long-term initiatives demands that the Commission engage in

37

long-term financial planning. For instance, in 2008 the Commission spent roughly $168,000,000 in compensation, benefits, and training for personnel, while in 2014, the Commission projected they would spend $226,177,000 on the same. This represents a staggering thirty-five percent increase on only this one piece of the budget during the Commission's five year plan. *Compare* http://www.ferc.gov/about/strat-docs/FY10-budg.pdf (Commission 2010 Budget Request at 55), *with* http://www.ferc.gov/about/strat-docs/fy14-budg.pdf (Commission 2014 Budget Request at 4). The unique ability to approve projects that ultimately are the source of the agency's funding, and then being able to forecast with great accuracy the potential revenue that can be derived from those sources, provides valuable and direct benefits to the Commission.

Given that the Commission's natural gas pipeline program is entirely reliant on the private companies that seek approvals from the Commission, and that the Commission derives significant and direct benefits from additional pipeline approvals, the Court below erred in ruling as a matter of law that DRN failed to state a claim that the Commission cannot fairly or constitutionally preside over the review and approval process of those natural gas pipeline project proposals. *See* 42 U.S.C. § 7178(a)(1); *see also Alpha Epsilon Phi Tau*, 114 F.3d at 844; *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 146 (1st Cir. 2008); *United Church*, 689 F.2d at 699.

### iii.    The Finite Lifespan of Natural Gas Pipeline Projects Compels New Pipeline Approvals

The natural gas pipeline projects that the Commission approves have limited lifespans that are dictated by a number of factors including the solvency of the companies involved, the term of the precedent agreements, and the lifespan of the pipeline. *See* Compl. at ¶ 142; JA___. As a result of these various factors pipelines eventually need to be replaced, removed, or abandoned, thereby removing sources of the Commission's funding.

For example, if a natural gas shipping company and/or the pipeline company subject to Commission jurisdiction becomes insolvent and cannot complete the term of the precedent agreement, the Commission loses a source of funding. Furthermore, the contracts approved for each of the projects are typically limited to between ten and fifteen years. *See, e.g.*, Compl. at ¶ 139 (identifying the term of the PennEast shipping contract as fifteen years); JA___. Therefore, unless a contract is renewed or another contract takes its place, the Commission loses a funding source.

Additionally, pipelines have finite structural lifespans, eventually the pipeline will need to be removed or abandoned as it is no longer structurally viable. For example, the PennEast pipeline – a proposed new pipeline purporting to use the best technology available -- estimates that it will only have an expected useful life span of only forty years. *See* Compl. at ¶ 144; JA___. Therefore, at some point

39

each and every pipeline will come out of service and eventually need to be replaced by a new source of Commission funding.

It is, under the alleged facts, inevitable that unless the Commission continues to approve new pipeline projects, the Commission will be reduced to an ever-shrinking pool of funds from which the Commission can secure its budget. The District Court opined that "it is not plausible that the potential for FERC's budget to 'dry up' if FERC stopped approving pipeline projects is imminent or tangible enough to create any bias." *Riverkeeper*, 243 F.Supp.3d at 154. However, the Court never provided DRN the opportunity to conduct discovery and present evidence on the imminence of this inescapable reality. Such discovery would have explored the rate at which pipelines cycle through their lifespans as a result of these various factors, and how much capacity would need to be added to compensate for these losses.

Likewise, discovery would have allowed development of a record on how high of a user fee the industry could absorb if the rate of pipeline approvals slows or stops, or whether or how the Commission has calculated what this rate would be. The Commission itself has identified this issue as a potential problem. For example, when the Commission first enacted the Funding Mechanism it was concerned that even a 2.5% decrease in net income would be too burdensome to the pipeline industry. *See* ¶ 30,746 ANNUAL CHARGES UNDER THE

40

OMNIBUS BUDGET RECONCILIATION ACT OF 1986, ORDER NO. 472, MAY 29, 1987, DOCKET NO. RM87-3-000, 18 CFR PARTS 154, 375, AND 382, 52 F.R. 21263, 52 F.R. 24153, Fed. Energy Reg. Comm'n Rep. P 30746.

Indeed, this is precisely a question this Honorable Court was interested in further exploring when confronted with the issue in the *No Gas Pipeline* case. *See NO Gas Pipeline*, 756 F.3d at 769. Specifically, the Court stated that one of the critical "factual issues not explored" in the context of the structural bias claim there was "the extent to which FERC's financial needs will increase with time and the ability of existing pipeline companies to absorb these costs and remain profitable." *Id*. However, the District Court's ruling has denied DRN even the opportunity to take discovery on these issues.

Furthermore, DRN was not provided the opportunity to take discovery on whether or how the Commission forecasts the way in which natural gas fits into the United States' energy mix in the future. For example, by some estimates all shale plays have peaked and older plays, like the Barnett Shale and Haynesville Shale, are in a gradual decline as the industry as a whole has seen a roughly 4% decline since early 2016. *See* Hughes, J. David, *2016 Shale Gas Reality Check*, Post Carbon Institute (December 2016), available at: http://www.postcarbon.org/wp-content/uploads/2016/12/Hughes_2016-Shale-Gas-Reality-Check-2016.pdf. Indeed, in a long-term outlook published in June of 2017, Bloomberg New Energy

41

Finance predicted that the natural gas market share in global power generation will "drop from 23 percent last year to 16 percent by 2040, and that gas-fired power generation capacity will start to decline after 2031." Farchy, Jack, *What if Big Oil's Bet on Gas is Wrong*, Bloomberg (July 18, 2017), available at: https://www.bloomberg.com/news/articles/2017-07-17/big-oil-sees-salvation-in-gas-but-what-if-it-s-the-wrong-bet (noting that "'[w]ind and solar are just getting too cheap, too fast' for gas to play a transitional role, said Seb Henbest, lead author of the BNEF report"). Because the District Court ruled without the benefit of discovery, there is no record to inform judgments on whether or how the Commission has accounted for these inevitable shifts in the energy mix, in the context of its pipeline approvals.

### iv.     The Commission's Naturally Rising Fixed Costs Requires the Commission to Approve Pipeline Projects

In addition to the natural lifecycle of pipelines that come out of service over time, the Commission also has naturally rising fixed costs that require additional sources of funding. *See* Compl. at ¶ 146; JA___. For example, the Commission's budget will naturally increase for at least two reasons: 1) increasing external overhead costs (e.g. rent, insurance premiums, maintenance, depreciation of assets, salaries, benefit payouts etc.); and 2) inflation. *See* Compl. at ¶ 147; JA___.

As DRN alleges, the Commission's fixed costs of operation naturally increase over time. *See* Compl. at ¶ 148 (citing the *FERC Congressional Budget*

42

*Request: Fiscal Year 2016*, Chairman Cheryl LaFleur, at v (denoting various agency rising fixed expenses)); JA\_\_\_. Without approving new projects the Commission can only generate revenue to cover such naturally rising costs by increasing the annual charge it levies on the industry. However, the Commission can raise those fees only so much; at some point pipeline companies will not be able to pay the amount required to be raised by the Commission. This is particularly true if no new pipelines are added, or the rate of additional pipeline approvals slow, while others are put out of service as they reach the end of their useful life-span.

However, without discovery there is not a record on which to judge at what point this would occur, and/or how it impacts the Commission's decision-making. DRN was denied the opportunity to take discovery on the specific fixed costs incurred by the Commission, and how they could, or could not, be accounted for by increasing the annual charges levied via the funding mechanism or by new pipeline approvals. The Commission's ability to absorb these ever-rising fixed costs again is one of the factual questions this Court was interested in addressing in the *No Gas Pipeline* matter. *See NO Gas Pipeline*, 756 F.3d at 769.

The District Court erred in rejecting, as a matter of law, DRN's claim that the Commission is at least unconstitutionally "tempted" to foster a pro-industry atmosphere in favor of project approvals so that the Commission's revenue stream

can continue to grow proportional to its naturally rising fixed costs of operation, and to replace the natural gas pipeline projects that inevitably come out of service. Indeed, if the Commission were to deny a natural gas pipeline project proposal -- an action it has never taken since the Funding Mechanism was instituted -- it would also deny itself a secure long-term revenue source for its naturally increasing budget. *Earth Island Inst.*, 351 F.3d at 1309-1310 (9th Cir. 2003) (Noonan, J., concurring) (noting that "[a]ny governmental agency would put a premium on an operation that gives it a perpetual revolving fund not dependent on Congress").

### v.    The Budget Act's Funding Mechanism is Uniquely Unconstitutional

The court below was troubled by the fact that roughly twenty-five other agencies received partial funding from user-fee funding structures. *See Riverkeeper*, 243 F.Supp.3d at 154. However, the suggestion that a blatant unconstitutionality is excusable because other agencies are somewhat similarly structured is deeply flawed. First, were every agency behaving unconstitutionally it would not absolve the Commission's bias, as courts have zero tolerance for partisan influence in adjudicative proceedings, as "a fair trial in a fair tribunal is a basic requirement of Due Process." *Murchison*, 349 U.S. at 136.

While there are a number of independent executive federal agencies that rely **in part** on user fees to provide a **portion** of their budgets, the Commission is the

44

only such agency of its type that derives funds for **all** of its operations from the companies that it regulates. This renders the Commission, and its Funding Mechanism, entirely unique in the context of federal administrative agencies. Indeed, of the twenty-five allegedly similar agencies, none is structured like the Commission:

- Only fifteen are "fully or nearly fully" funded by fees - like the Commission.[2]
- Of these, only eight are Independent Executive Entities - like the Commission.[3]
- Of these, only seven presently exist.[4]
- Of these, only five are Independent Executive *Agencies* - like the Commission.[5]
- Of these, only three conduct direct adjudications - like the Commission.[6]
- Of these, only one adjudicates in a way that even remotely affects its finances.[7]

---

[2] U.S. Government Accountability Office: Federal User Fees, http://www.gao.gov/assets/230/225030.pdf.

[3] Compare referencing the U.S. Government Accountability Office study with the list of independent governmental entities found at the USA.gov Website, http://www.usa.gov/Agencies/Federal/Independent.shtml.

[4] The Panama Canal Commission ceased to exist on December 31, 1999. Federal Register Website, http://www.gpo.gov/fdsys/pkg/FR-1999-12-30/pdf/99-33908.pdf.

[5] *Id.* fn. 3. The Tennessee Valley Authority is a federal *corporation*, 16 U.S.C. § 831, as is the USPS, 39 U.S.C. § 101 *et seq*.

[6] The Farm Credit Administration (12 U.S.C. § 2266), the National Credit Union Administration (12 U.S.C. § 1766) and the Nuclear Regulatory Commission (42 U.S.C. § 2201) directly adjudicate; the others do not. *See* 12 U.S.C. § 4521 (indicating the Federal Housing Finance Agency must rely on the Department of Justice to initiate prosecutions); *see also* 5 U.S.C. § 8472 (noting the FRTIB primarily manages investments); *1*2 U.S.C. § 2268 (FCA); 12 U.S.C. § 1755 (NCUA assesses basic charges against all participating credit unions).

[7] The Nuclear Regulatory Commission is structured similarly -- though, not identically -- to the Commission. 42 U.S.C. § 2214.

45

- This one, the Nuclear Regulatory Commission, has no ability or incentive to adjudicate based on its bottom line. Unlike the Commission, which may adjudicate to cover all its costs, the Nuclear Regulatory Commission may only recover its Congressionally-approved "budget authority." 42 U.S.C. § 2214. Moreover, unlike the Commission, any costs the Nuclear Regulatory Commission recovers must directly relate to regulation it conducts. *Id*.

The Commission's Funding Structure is therefore uniquely unconstitutional, and therefore a finding of unconstitutional bias would not threaten any other federal agency.

### vi.    Examples of Prior Actual Bias Provide Evidence of the Commission's Unconstitutional Appearance of Bias

The outcomes described below provide evidence of bias which supports DRN's claim of structural bias, or the appearance of structural bias. Specifically, DRN alleges that the Commission's possible temptations "frequently manifest themselves in impermissible actual bias in agency adjudications -- or, at least, in highly questionable and irregular agency behavior indicative of structural bias." Compl. at ¶ 175; ¶¶ 176-240; JA___. While the District Court found that such examples are "not relevant to the court's analysis," *Riverkeeper*, 243 F.Supp.3d at 154, not only do DRN's averments of the Commission's biased actions support DRN's claims, these example alone are enough to demonstrate that there is an appearance of Commission bias with regard to the Funding Mechanism.

In *Essos Standard Oil Co. v. Cotto*, the First Circuit considered circumstantial evidence of bias to support its finding of structural bias. *See Esso*

46

*Standard Oil Co. v. Cotto*, 389 F.3d 212, 219 (1st Cir. 2004). In that case the court considered evidence including "general unfairness throughout the hearings," "procedural irregularities," and the one sided decision-making of the hearing officers. *Id*.

In the instant matter there are similar examples of unfairness and one-sided decision-making. For example, evidence of the Commission's appearance of bias lies in the historical record of companies seeking approval of projects before the Commission. *See* Compl. at ¶¶ 178-240; JA___. Since the funding mechanism was put in place, the Commission has **never** denied an application for a natural gas pipeline project that was submitted for vote to the Commissioners. *Id*. at ¶ 179. Indeed, DRN is only aware of three projects under the natural gas program that have been rejected via a vote by the Commission in its history. Furthermore, the reason why these projects were rejected all relate to the insufficiency of the proposed underlying contracts. In other words, the three projects would not be dependable sources of funding for the Commission, which further supports DRN's bias claims.

These three rejected projects include the *Turtle Bayou Project*, the *Ozark Project*, and the *Jordan Cover Project*. The *Turtle Bayou Project* was not a natural gas pipeline project, but rather a storage facility, that was rejected because no sufficient contracts showing demand were provided to the Commission. *See Turtle*

47

*Bayou*, 135 FERC ¶ 61,233.   Likewise, *Ozark* involved the construction and operation of "taps and measuring facilities," not the construction of a pipeline, and was rejected because, *inter alia*, the Commission could not identify "any contracts to sell gas to the ultimate recipients." 43 FERC ¶ 61,443. Lastly, the *Jordan Cove Project* was not a dedicated pipeline; rather, it was a liquefied natural gas export facility with an appurtenant feeder pipeline, which was ultimately rejected because the Commission did not find sufficiently binding contracts had been obtained by the project applicant. *See* 154 FERC ¶ 61,190. With regard to *Jordan Cove*, the Commission is currently entertaining yet another application for this project, which will eventually be approved now that the applicant has secured precedent agreements. *See* Commission Docket No. PF17-4-000, accession No. 20170210-3032 (filed February 10, 2017); AD016-18. The unifying theme among these limited rejections is that the Commission was not convinced of the economic viability and sustainability of the projects.

Additionally, the Commission's record shows that it unlawfully pre-determines the environmental review process pursuant to the National Environmental Policy Act for natural gas pipeline project applications. *See* Compl. at ¶¶ 210-218; JA___. While Environmental Assessments are specifically designed to be the vehicle to determine when an Environmental Impact Statement is necessary, the Commission has **never** issued an Environmental Assessment that

48

found possible significant impacts, or even unknown impacts, which would then require a full Environmental Impact Statement. *Id*. at ¶ 215; JA___. Instead, the Commission "eyeballs" a project applicant's initial request, and subsequently categorizes the project to receive either an Environmental Assessment or an Environmental Impact Statement. *Id*. at ¶ 214; JA___. Not only does the Commission have a 100 percent approval rate for pipeline projects that come before it for a vote, it also has a 100 percent rate of pre-determining that projects will not have significant environmental impacts or unknown environmental impacts.

Lastly, since the funding mechanism was put in place the Commission has **never** granted a request for rehearing to a non-industry party challenging a natural gas pipeline Certificate. *See* Compl. at ¶ 207; JA___. The Commission's unwillingness to engage with aggrieved non-industry parties and steamrolling their rights is further evidence of the Commission's appearance of bias. Similar to *Essos*, when "[t]aken together" these pieces of evidence show that the Commission's process is fundamentally broken and "does not measure up to the yardstick of what an impartial adjudicator should be in accordance with Due Process." *Esso*, 389 F.3d at 219.

### vii. Congress Does not Constrain or Control the Commission's Budget

49

The District Court placed great weight on the fact that the "plain language of the statute indicates that FERC does not have control over its own budget." *Riverkeeper*, 243 F.Supp.3d at 154. However, as described above, whether or not the Commission's budget is constrained or controlled by Congress is irrelevant to the fact that the Funding Mechanism incentivizes pipeline approvals because the approvals confer a number of unique direct benefits to the Commission irrespective of any short-term increases in budget. *See supra*, at 32-38.

Additionally, there is a factual dispute over the practical effect of Congress' alleged control over the Commission's budget. The design of the Funding Mechanism provides no statutory incentives or safeguards to insure that the Commission does not get everything it asks for from Congress because Congress knows that the money provided will be repaid in full. *See* Compl. at ¶¶ 153-166; JA___. Over a thirty year time period, which included varying instances of congressional dysfunction and federal budget cuts, the Commission still managed to secure over ninety-nine percent of the monies it requested in each of its ever-swelling budget requests.

Therefore, the historical averments in the Complaint evince that the design and function of the Funding Mechanism encourages the Commission to set its own budget at whatever increasing amount it deems appropriate, and then receives exactly that amount from Congress because Congress has no incentive to limit the

50

request. Even if the District Court's statement stands for the limited proposition that it is theoretically possible for Congress to set limits, its position is still unpersuasive because it does not address how the Funding Mechanism has actually operated over the last thirty years. *See Jackson v. Indiana*, 406 U.S. 1845 (1972) (finding a violation of due process where the "practical effect" of a statute differentiated from its stated purpose); *see also Noatex Corp. v. King Const. of Houston, LLC*, 864 F.Supp.2d 478, 490 (N.D. Miss. 2012) (finding that while a statute had an "admirable purpose" that grew out of a "legitimate concern" that its "practical effect" violated due process and therefore was unconstitutional).

If instead of being funded by the regulated industry the Commission's budget was sourced from income taxes increases, federal deficit increases, or accompanying cuts in other deferral budgets, then Congress would be required to weigh the costs of one of these three options against the benefits associated with allocating the funds to Commission. *See* Compl. at ¶ 161; JA___. Indeed, these considerations are part of the balancing involved with other federal agencies. *Id*. at ¶ 162; JA___. However, under the Funding Mechanism no such difficult balancing occurs, and as a result over the last decade the Commission has seen its annual budget grow by an astonishing fifty-one percent, rocketing from sub-$200-Million in 2004 to a more than $300-Million in 2014, which is more than double the rate of its parent government agency. *Id*. at ¶¶ 157-158 (Comparing *FERC Congressional*

51

*Budget Request: Fiscal Year 2004*, Chairman Pat Wood III, at 1 (requesting $199,400,000), with *FERC Congressional Budget Request: Fiscal Year 2014*, Chairman Jon Wellinghof, at 2 (requesting $302,600,000)); JA___. As such, the Congressional appropriation as codified in the Funding Mechanism has no meaningful effect on controlling or constraining the exponential growth of the Commission's budget.  The District Court's rejection of this claim, as a matter of law, was in error.

### D.     The Court Below Failed to Address or Acknowledge DRN's Separate Due Process Claim Regarding the Commission's Unlawful Use of Tolling Orders

The Commission's use of tolling orders deprives DRN of constitutionally guaranteed due process rights by preventing timely and effective judicial review of contested agency action. As DRN specifically alleges in the Complaint, the Commission's bias is further animated by its regular use of "tolling orders" to block timely judicial review of agency actions, Compl. at ¶¶ 191-209; JA___, and this separately violates Plaintiffs' due process rights. *Id*. at ¶¶ 270-271; JA___. The District Court did not address this claim in its Opinion.

In the Natural Gas Act, Congress plainly sought to balance the laudatory goal of allowing the Commission a reasonable opportunity to correct erroneous orders prior to judicial review, against the competing goal of allowing aggrieved parties to obtain timely judicial review of such orders. The balance that Congress

52

struck was to prohibit judicial review of a Commission order unless a party first seeks rehearing of such order within thirty days, 15 U.S.C. § 717r(a), while also prohibiting the Commission from taking more than thirty days "to grant or deny rehearing or to abrogate or modify its order." 15 U.S.C. § 717r(a). The Commission has routinely failed to comply with section 717r(a) because the Commission regularly fails to take meaningful action on rehearing requests, and instead simply grants itself more time, which is plainly not one of the "acts" Congress authorized the Commission to take in section 717r(a). *See Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) ("In construing a statute, we begin with the plain language, giving all undefined terms their ordinary meaning"). As such, the Commission simply does not have any statutory basis for issuing the tolling orders.

The Commission's issuance of tolling orders has clearly thwarted Congress' goal of allowing for timely judicial review of Commission orders within thirty days of the issuance of a certificate. To find otherwise and allow the Commission to extend the thirty-day statutory timeframe for an **indefinite** and **unlimited** period would render Congress' drafting a complete nullity. *See Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("It therefore flouts the rule that 'a statute should be construed so that effect is given to all its provisions, so that no part will be

inoperative or superfluous'") (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

The Commission's use and abuse of its tolling order powers have never been reviewed or ruled upon by any court in the context of an institutional bias due process challenge, or in the context of tolling orders issued specifically pursuant to natural gas pipeline projects under Section 7 of the Natural Gas Act, and thus present a factual and legal question of first impression. While several circuits have upheld the issuance of tolling orders in other contexts, *see, e.g.*, *Kokajko v. FERC*, 837 F.2d 524 (1st Cir. 1988); *Gen. Am. Oil Co. of Texas v. Fed. Power Comm'n*, 409 F.2d 597, 599 (5th Cir. 1969), none of these cases involve a situation where a pipeline company is issued a Certificate thereby automatically conferring power to take landowners' property via eminent domain, and also allowing construction activity to begin prior to an aggrieved party having the opportunity to challenge the legal sufficiency of the Certificate in court.

By way of example, the Delaware Riverkeeper Network submitted a rehearing request to the Commission in January of 2015 citing several ways in which the Commission violated the Clean Water Act when it issued a Certificate for a pipeline project in Pennsylvania. *See* Compl. at ¶ 200; JA___. The Commission sat on the rehearing request for over a year, and during that time issued at least twenty different Letter Orders allowing the pipeline company to

54

proceed with all forms of construction activity. *Id*. at ¶ 201; JA___. Because the Commission did not act on DRN's rehearing request, the Commission effectively blocked any effective judicial review of the Certificate. *Id*. at ¶ 203; JA___. DRN's members' property, environmental, aesthetic and recreational interests were harmed by the construction activities, which included tree-felling, grading, trenching, wetland conversions, and blasting activities prior to DRN being able to challenge the Certificate in court. *Id*. at ¶ 202; JA___.

DRN is again in the same situation. DRN submitted a rehearing request to the Commission on February 14, 2017 with regard to Tennessee Gas Pipeline Company's Orion pipeline project. *See* AD009 (Delaware Riverkeeper Network Rehearing Request, submitted February 14, 2017). On March 13, 2017 the Commission "granted" the rehearing request "for the limited purpose of further consideration." *See* AD011 (Commission Letter Order, March 13, 2017). Over the last six months the Commission has issued numerous letter orders authorizing all construction activities. *See* AD012-15 (Weekly Status Report for September 4, 2017 through September 10, 2017). Indeed, "final grade" and "restoration activities" are currently underway. *Id*. Despite the fact that DRN contests that the legal sufficiency of the Certificate, DRN simply has no way of obtaining effective judicial review of the prior to this construction taking place, and will not likely have the case briefed until the entire project is completed.

1885588.1/50442

The Commission's use of tolling orders is especially egregious in this context considering the limitations on what the Commission must consider. Unlike other rehearing requests, nothing new is, or can be, considered by the Commission in a rehearing request for a Section 7 natural gas pipeline project. *See NO Gas Pipeline*, 756 F.3d at 770 (noting that the Commission "rejects requests for rehearing that raise issues not previously presented unless parties show that the request is 'based on matters not available for consideration . . . at the time of the . . . final decision.' 18 C.F.R. § 385.713(c)(3)"). The scope and depth of the Commission's inquiry is therefore extremely limited, as the Commission has already considered and responded to all of the issues presented in the rehearing request. The thirty days afforded to the Commission to make decision was never contemplated to be exclusively used by the Commission to craft comprehensive decisional documents to better position the Commission to fend-off potential appeals.

The District Court's dismissal of this claim was in error.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the District Court's Order be reversed, the case be remanded for further proceedings and any other relief the Court deems just and equitable.

Respectfully submitted this 25th day of September 2017,

56

*s/ Aaron Stemplewicz*

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19107
Phone: 215.369.1188
Fax: 215.369.1181
aaron@delawareriverkeeper.org

Jordan Yeager
Curtin & Heefner LLP
2005 S. Easton Road, Suite 100
Doylestown, PA 18901
jby@curtinheefner.com


Counsel for: *Petitioners Delaware Riverkeeper Network and the Delaware Riverkeeper*

1885588.1/50442

# CERTIFICATE OF COMPLIANCE

1.     This Brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this Brief contains 12,921 words, excluding the parts of the

brief exempted  by Fed. R. App. P. 32 (a)(7)(B)(iii).

2.     This Brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in proportionally spaced typeface using Microsoft Word in

14 Point Times New Roman.

Dated: September 25, 2017                    *s/ Aaron Stemplewicz*

                                                                        Aaron Stemplewicz
                                                                        Counsel for: *Petitioners Delaware
                                                                        Riverkeeper Network and the
                                                                        Delaware Riverkeeper*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the Court's Administrative Order Regarding Electronic Case Filing, I hereby certify that I have, this 25th day of September 2017, I filed the foregoing with the Court via the Court's CM/ECF system and served the foregoing upon all counsel listed in the Service Preference Report via email through the Court's CM/ECF system.

Dated: September 25, 2017                 *s/ Aaron Stemplewicz*

Aaron Stemplewicz
Counsel for: *Petitioners Delaware Riverkeeper Network and the Delaware Riverkeeper*

Docket Number 17-5084

Oral Argument Not Yet Scheduled

**IN THE
UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA**

DELAWARE RIVERKEEPER NETWORK; MAYA VAN ROSSUM, the Delaware Riverkeeper,

*Plaintiff/Appellants*,

v.

FEDERAL ENERGY REGULATORY COMMISSION

*Defendants/Appellee*,

and

PENNEAST PIPELINE COMPANY,

*Defendant-Intervenor/Appellee*.

*Appeal from the United States District Court for the District of Columbia, No. 1:16-cv-416*

**APPELLANTS' ADDENDUM**

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
aaron@delawareriverkeeper.org

Jordan Yeager
Curtin & Heefner LLP
2005 S. Easton Road, Suite 100
Doylestown, PA 18901
jby@curtinheefner.com

## Federal Statutes

15 U.S.C. § 717f(c)(1)(A) ...................................................................AD001

15 U.S.C. § 717f(e) ...........................................................................AD002

15 U.S.C. § 717f(h) ..........................................................................AD003

28 U.S.C. § 1291 ..............................................................................AD004

42 U.S.C. § 7171(a)-(b) ...................................................................AD005

*42 U.S.C. § 7178 .............................................................................AD006

## Federal Regulations

18 C.F.R. § 382.202 ..........................................................................AD007

## State Constitutions

Pa. Const. Art. I................................................................................AD008

## Additional Material

Delaware Riverkeeper Network Rehearing Request,
    submitted February 14, 2017 .......................................................AD009

Commission Letter Order, March 13, 2017 .....................................AD010

Weekly Status Report for September 4, 2017 through September 10, 2017 ...AD012

Commission Docket No. PF17-4-000, accession No. 20170210-3032 (filed
    February 10, 2017) .....................................................................AD016

15 U.S.C. § 717f(c)(1)(A):

No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however*, That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on February 7, 1942, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after February 7, 1942. Pending the determination of any such application, the continuance of such operation shall be lawful.

15 U.S.C. § 717f(e):

Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

15 U.S.C. § 717f(h):

When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided*, That the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $3,000.

28 U.S.C. § 1291:

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292 (c) and (d) and 1295 of this title.

42 U.S.C. § 7171(a)-(b)

(a)FEDERAL ENERGY REGULATORY COMMISSION; ESTABLISHMENT
There is established within the Department an independent regulatory commission to be known as the Federal Energy Regulatory Commission.

(b)COMPOSITION; TERM OF OFFICE; CONFLICT OF INTEREST; EXPIRATION OF TERMS
(1)
The Commission shall be composed of five members appointed by the President, by and with the advice and consent of the Senate. One of the members shall be designated by the President as Chairman. Members shall hold office for a term of 5 years and may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office. Not more than three members of the Commission shall be members of the same political party. Any Commissioner appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed shall be appointed only for the remainder of such term. A Commissioner may continue to serve after the expiration of his term until his successor is appointed and has been confirmed and taken the oath of Office, except that such Commissioner shall not serve beyond the end of the session of the Congress in which such term expires. Members of the Commission shall not engage in any other business, vocation, or employment while serving on the Commission.

(2)Notwithstanding the third sentence of paragraph (1), the terms of members first taking office after April 11, 1990, shall expire as follows:
(A)
In the case of members appointed to succeed members whose terms expire in 1991, one such member's term shall expire on June 30, 1994, and one such member's term shall expire on June 30, 1995, as designated by the President at the time of appointment.
(B)
In the case of members appointed to succeed members whose terms expire in 1992, one such member's term shall expire on June 30, 1996, and one such member's term shall expire on June 30, 1997, as designated by the President at the time of appointment.
(C)
In the case of the member appointed to succeed the member whose term expires in 1993, such member's term shall expire on June 30, 1998

42 U.S.C. § 7178:

Except as provided in paragraph (2) and beginning in fiscal year 1987 and in each fiscal year thereafter, the Federal Energy Regulatory Commission shall, using the provisions of this section and authority provided by other laws, assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year.

18 C.F.R. § 382.202

The adjusted costs of administration of the **natural gas regulatory program** will be assessed against each **natural gas pipeline company** based on the proportion of the total gas subject to **Commission** regulation which was sold and transported by each company in the immediately **preceding calendar year** to the sum of the gas subject to the **Commission** regulation which was sold and transported in the immediately **preceding calendar year** by all natural gas pipeline companies being assessed annual charges.

Pennsylvania Constitution, Article I, Section 27:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.
(May 18, 1971, P.L.769, J.R.3)

# UNITED STATES OF AMERICA
## BEFORE THE
## FEDERAL ENERGY REGULATORY COMMISSION

Tennessee Pipeline Company, LLC    )        Docket No. CP16-4-000

## REQUEST FOR REHEARING OF DELAWARE RIVERKEEPER NETWORK

Pursuant to Rule 713 of the Rules of Practice and Procedure of the Federal Energy Regulatory Commission ("Commission"), 18 C.F.R. § 385.713 (2010), Delaware Riverkeeper Network ("DRN") hereby requests rehearing and rescission of the Commission's February 2, 2017 Order ("Order") granting a Certificate of Public Necessity and Convenience ("Certificate") to Tennessee Gas Pipeline Company, L.L.C. ("Tennessee") to construct the Orion Pipeline Project ("Project"). DRN seeks rehearing and rescission of the Commission's Order because the environmental review underlying the conclusions in the Order fails to meet the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. (2006), and its implementing regulations, 40 C.F.R. Pts. 1500-08. Based on this flawed environmental review, the Commission improperly determined that the public benefits of the Project outweigh its adverse impacts, thus violating the Natural Gas Act ("Act"), 15 U.S.C. §§ 717f (2006) and its implementing regulations, 18 C.F.R. Part 157 (2011).

## I.    STATEMENT OF RELEVANT FACTS

AD009

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION


Tennessee Gas Pipeline Company, LLC                    Docket No. CP16-4-001


ORDER GRANTING REHEARINGS FOR
FURTHER CONSIDERATION


(March 13, 2017)

Rehearings have been timely requested of the Commission's order issued on February 2, 2017, in this proceeding.  *Tennessee Gas Pipeline Company, L.L.C.*, 158 FERC ¶ 61,110 (2017).  In the absence of Commission action within 30 days from the date the rehearing requests were filed, the request for rehearing (and any timely requests for rehearing filed subsequently)[1] would be deemed denied. 18 C.F.R. § 385.713 (2016).

In order to afford additional time for consideration of the matters raised or to be raised, rehearing of the Commission's order is hereby granted for the limited purpose of further consideration, and timely-filed rehearing requests will not be deemed denied by operation of law.  Rehearing requests of the above-cited order filed in this proceeding will be addressed in a future order.  As provided in 18 C.F.R. § 385.713(d), no answers to the rehearing requests will be entertained.


Kimberly D. Bose,
Secretary.


---

[1] *See San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange, et al.*, 95 FERC ¶ 61,173 (2001) (clarifying that a single tolling order applies to all rehearing requests that were timely filed).


AD010

Document Content(s)

CP16-4-001.DOC.......................................................1-1

AD011

USCA Case #17-5084      Document #1694523         Filed: 09/25/2017      Page 83 of 90



September 13, 2017

Ms. Kimberly D. Bose, Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

> Re:      Tennessee Gas Pipeline Company, L.L.C., Docket No. CP16-4-000
>          Orion Project
>          Weekly Status Report for September 4, 2017 through September 10, 2017

Dear Ms. Bose:

Pursuant to Environmental Condition No. 7 of the Commission's Order Issuing Certificate,[1] Tennessee Gas Pipeline Company, L.L.C. ("Tennessee") is filing with the Federal Energy Regulatory Commission ("Commission") the enclosed status report and attachments for the above-referenced project.

In accordance with the Commission's filing requirements, Tennessee is submitting this filing with the Commission's Secretary through the eFiling system. Tennessee is also providing copies of this filing to the Office of Energy Projects. A copy of this filing is being served on all parties of record.

Respectfully submitted,

TENNESSEE GAS PIPELINE COMPANY, L.L.C.


By:    */s/ Ben J. Carranza*
       Ben J. Carranza, P.E.
       Director of Regulatory
       (713) 420-5535

Attachments

cc:    Keith Rodgers (Commission Staff)
       Troy Enright (NRG)
       Service List

---

[1] Tennessee Gas Pipeline Company, L.L.C., 158 FERC ¶ 61,110 (2017).

AD012

Orion Project ("Project"), Docket No. CP16-4-000
**Weekly Status Report**
**Reporting Period:  September 4, 2017 through September 10, 2017**

A.    **Update on efforts to obtain necessary federal authorizations**:

All federal authorizations have been obtained.

B.    **Construction status of the Project**:

**Work completed:**

Construction Loops:

- H&M continues right-of-way ("ROW") activities, including tie-ins, road bores, trenching, lowering-in, backfilling and rough cleanup. The contractor also continues the bore at the cultural site.
- Final grade and restoration began on the western side of Loop 322.
- Hydrostatic testing of fabrication within Pipeyard 2 was completed.
- Environmental inspectors (EI) continue to inspect the project activities daily, complete daily reports, and train new employees.
- Timber rattlesnake monitors continue to clear areas ahead of construction crews, where appropriate.  Monitors file daily reports summarizing data suggested by the PA Fish and Boat Commission.  Rattlesnake monitors are relocating snakes to suitable habitat outside the limits of disturbance, when necessary.
- Wetland and waterbody crossings continue.  Wetland and waterbody crossing schedules are being provided to the agencies.

Modifications to Compressor Station 323
- Demobilization and restoration activities continue at the station.
- Daily EI inspections and environmental training continue, as necessary.

**Work planned:**

Construction Loops:
- Tennessee EIs will continue to monitor the ROW for compliance with the FERC Certificate as well as other Federal and state permits. Tennessee EIs will continue to train new employees, as necessary.
- H&M to continue ROW activities including, road bores, trenching, lowering-in, backfilling, rough cleanup and final grade and restoration.
- Reconstruction of timber rattlesnake habitat will begin and timber rattlesnake monitoring will continue.

Modifications to Compressor Station 323
- Additional interior work at the compressor building and asphalt patching are planned for next week.  Work at the station is likely to conclude this week.

**Schedule changes affecting stream crossings or other environmentally sensitive areas in the reporting period:**

No schedule changes are anticipated in the reporting period.

AD013

USCA Case #17-5084    Document #1694523    Filed: 09/25/2017    Page 85 of 90

**Orion Project ("Project"), Docket No. CP16-4-000**
**Weekly Status Report**
**Reporting Period:  September 4, 2017 through September 10, 2017**

C.      **Problems encountered and instances of non-compliance observed by the Environmental Inspector during the reporting period:**

A self-reported problem area was issued on September 5, 2017 for use of an unapproved access to the ROW from Skycrest Road near milepost 0.2.

A self-reported non-compliance was issued on September 8, 2017 for sediment laden water runoff entering Swamp Brook (stream S8a) and other adjoining resources near milepost 2.43. Stormwater runoff from recent rain events as well as water from dewatering activities was contributing to the creation of sediment laden water within wetland W15a that was entering an unnamed tributary to Swam Brook (S-7a) and then reaching Swamp Brook (S-8a).

A self-reported problem area was reported on September 9, 2017 for sediment off ROW and erosion control devices ("ECD") requiring maintenance near Bethel School Road at approximately milepost 0.1.  Stormwater runoff from recent rain events had overtopped a waterbar and then overtopped compost filter sock before discharging off the ROW into a well vegetated area.

D.      **Corrective actions taken in response to each instance of non-compliance, cost of corrective action:**

On September 5, 2017, the contractor was reminded that only approved access to the ROW with rock construction entrances may be used as depicted in the Project Erosion and Sedimentation Control Plans.  The contractor has abandoned using this unapproved access from Skycrest Road.

On September 8, 2017, Tennessee immediately stopped work activities near Swamp Brook and installed additional ECDs.  A trench was excavated across wetland w15a along the approximate proposed pipeline centerline, and then dewatered to an additional dewatering structure constructed to the east of wetland 15a.  Michael Leggiero with the USACE was onsite for a scheduled inspection and observed the silt laden water discharge.  Tennessee reported the non-compliance to Carl DeLuca (PADEP) and Mykla Pigeon (Wayne County Conservation District) on September 8, 2017.

On September 9, 2017, the contractor conducted maintenance of the ECDs near Bethel School Road by removing sediment from the compost filter sock and enlarging the waterbar.

E.      **Effectiveness of all corrective actions implemented:**

The corrective actions taken were effective in addressing this self-reported problem area.

F.      **Description of any landowner/resident complaints which may relate to compliance with requirements of this Order, and measures taken to satisfy their concerns:**

No landowner/resident complaints were received during this reporting period.

G.      **Copies of any correspondence received by Tennessee from other federal, state, or local permitting agencies concerning instances of non-compliance and Tennessee's response:**

No correspondence from other federal, state, or local permitting agencies concerning instances of non-compliance were received during this reporting period.

AD014

USCA Case #17-5084    Document #1694523    Filed: 09/25/2017    Page 86 of 90

Document Content(s)

Orion Wkly Const Rpt 9_13_17.PDF...................................1-3

AD015

# FEDERAL ENERGY REGULATORY COMMISSION
WASHINGTON, D.C. 20426
February 10, 2017

OFFICE OF ENERGY PROJECTS

In Reply Refer To:
OEP/DG2E/Gas 3
Jordan Cove Energy Project LP
Pacific Connector Gas Pipeline LP
Docket No. PF17-4-000

Elizabeth Spomer
President and CEO
Jordan Cove Energy Project LP
Pacific Connector Gas Pipeline LP
5615 Kirby, Suite 500
Houston, TX 77005

**Re: Approval of Pre-Filing Request**

Dear Ms. Spomer:

Thank you for your letter, filed January 23, 2017, requesting use of the Federal Energy Regulatory Commission's (FERC or Commission) pre-filing review process for Jordan Cove Energy Project LP's (Jordan Cove) planned Liquefied Natural Gas (LNG) Terminal and Pacific Connector Gas Pipeline LP's (Pacific Connector) planned Pipeline Project in Oregon (together referenced below as the Project). We believe that beginning the Commission's review of this proposal prior to the receipt of your applications will greatly improve our ability to identify issues early and address them in our environmental document.

As stated in your letter, Jordan Cove intends to construct and operate an LNG export terminal at Coos Bay, Oregon. The terminal would consist of a gas processing plant, liquefying equipment, two storage tanks, a transfer line, loading platform, marine berth, and access channel. In addition, the terminal would include emergency and hazard systems, electrical systems, security and control facilities, a utility corridor and road system, administrative buildings, and a temporary workforce housing camp. The terminal would be designed to liquefy about 7.8 metric tons per annum of LNG for export to markets across the Pacific Rim.

Pacific Connector plans to construct and operate a 233-mile-long 36-inch-diameter pipeline. It would originate at interconnections with the existing systems of Ruby Pipeline LLC and Gas Transmission Northwest LLG near Malin, Oregon and end at Jordan Cove's terminal at Coos Bay. The pipeline would cross Klamath, Jackson, Douglas, and Coos Counties, Oregon. It would be capable of transporting about 1.2

AD016

billion cubic feet per day of natural gas. Associated with the pipeline would be the new Klamath Compressor Station (41,000 horsepower) at the eastern starting point for the pipeline near Malin; 4 new meter stations (Klamath-Beaver and Klamath-Eagle co-located with the Klamath Compressor Station, Clarks Branch, and Jordan Cove); 5 new taps for future service to communities in southern Oregon; 5 new pipe launchers and receiver units; 17 main line block valves; and a gas control communication system.

Your letter also stated that Jordan Cove and Pacific Connector intends to file their applications on or about August 30, 2017. When Jordan Cove and Pacific Connector files their applications with the Commission, we will evaluate the progress made during the pre-filing process, based in part on your success in resolving the issues raised during scoping. Once we determine that the applications are ready for processing, we will establish a schedule for completion of the environmental document and for the issuance of all other federal authorizations.

In your February 7, 2017 letter conveying proposals for a third-party contractor to assist us in preparing the National Environmental Policy Act (NEPA) documentation for the Project, you documented that you widely circulated your Request for Proposals, and only two companies responded with bids. We found your process for soliciting and submitting proposals is consistent with our recent "Handbook for Using Third-Party Contractors to Prepare Environmental Documents" (August 2016 revision). My staff has reviewed the proposals submitted, and we have selected Tetra Tech as the third-party contractor to work solely under the direction of the Commission staff. Factors considered in this selection included technical approach, personnel qualifications, past work history, and clearance of any organizational conflict of interest. I request that you proceed with executing a contract with Tetra Tech and prepare a Memorandum of Understanding (MOU) between the FERC, Jordan Cove and Pacific Connector, and Tetra Tech.

As specified in the MOU, Commission staff must have complete control over the scope, content, and quality of the contractor's work; sole ownership of all documents (other than those related to financial aspects) produced under the contract; and complete control over the schedule for completion of the third-party contractor's work. Commission staff will independently evaluate the results of the third-party contractor's work and the Commission, through its staff, will bear ultimate responsibility for full compliance with the requirements of NEPA.

- 3 -

If you have any questions, please contact the Office of Energy Projects'
Environmental Project Manager for the Project, Paul Friedman at (202) 502-8059, or
email at paul.friedman@ferc.gov.


                                              Sincerely,



                                              Ann F. Miles
                                              Director
                                              Office of Energy Projects



cc:    Public File, Docket No. PF17-4-000

AD018

USCA Case #17-5084     Document #1694523          Filed: 09/25/2017     Page 90 of 90

Document Content(s)

PF17-4-000Letter.DOC..................................................1-3